AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America<br><br>v.<br><br>EARL SHAMBURGER,<br><br>Defendant. | Case No.   2:23-mj-03013-DUTY |

**FILED**
CLERK, U.S. DISTRICT COURT

06/13/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: ___GR___ DEPUTY

**LODGED**
CLERK, U.S. DISTRICT COURT

6/13/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: ___CO___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 20, 2023, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Firearms |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Donovan Manning
_____
Complainant's signature

Donovan Manning, ATF Special Agent
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        June 13, 2023, 4:07 p.m.          Karen L. Stevenson
_____
Judge's signature

City and state:   Los Angeles, California       Hon. Karen L. Stevenson, U.S. Magistrate Judge
_____
Printed name and title

## AFFIDAVIT

I, Donovan Manning, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against Earl SHAMBURGER ("SHAMBURGER") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of Firearms on March 20, 2023.

2.   This affidavit is also made in support of an application for warrants to search a 2015 black Maserati, bearing license plate #9FCZ599, currently registered and operated by SHAMBURGER (the "SUBJECT VEHICLE") as described more fully in Attachment A-1; the residence of SHAMBURGER at 8711 South Harvard Boulevard, Apartment 413 in Los Angeles, California (the "SUBJECT PREMISES") as described more fully in Attachment A-2; and the person of SHAMBURGER as described more fully in Attachment A-3.

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) (Engaging in the Business of Dealing Firearms Without a License); 18 U.S.C. § 922(g)(1) (Prohibited Person in Possession of Firearm/Ammunition); 18 U.S.C. § 933 (Firearms Trafficking); 18 U.S.C. § 922(a)(3) (Receipt of Firearm from Out of State by an Unlicensed Person); and 18 U.S.C. § 371 (Conspiracy) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been since May 2021.  I am currently assigned to the ATF Glendale I Field Office in Glendale, California.  I am a graduate of the Criminal Investigator Training Program and the ATF Special Agent Basic Academy at the Federal Law Enforcement Training Center in Glynco, Georgia, where I received training in federal laws and regulations.  I regularly refer to these laws and regulations during the course of my duties, and have participated in investigations, and the execution of warrants for violations of these laws and regulations. Before working as a Special Agent, I graduated summa cum laude with a bachelor's degree in Criminology from the University of Akron.

## III. **SUMMARY OF PROBABLE CAUSE**

6.    After being identified, via Instagram, as a firearms dealer, Earl SHAMBURGER, a convicted felon, sold 14 firearms and

ammunition to a firearms customer who was, in fact, a confidential informant ("CI")[1] working for ATF on 7 separate occasions from March 2023 to May 2023. In several of these transactions, SHAMBURGER indicated that he has a source for methamphetamine and discussed obtaining drugs for the CI.

### IV. STATEMENT OF PROBABLE CAUSE

7.    Based on my review of law enforcement reports, audio and video recordings, conversations with law enforcement, SHAMBURGER's Instagram accounts, and my personal involvement in the investigation, I know the following:

**A.   SHAMBURGER Sells Two Firearms to the CI on March 13, 2023**

8.    On March 6, 2023, in a recorded call that I reviewed, the CI contacted SHAMBURGER at his registered phone number regarding the sale of firearms.[2] A male -- with a voice that matched SHAMBURGER's voice based on my review of videos from

---

[1] The CI has worked for ATF since 2011. He/she has felony convictions for RICO in 2010 and possession of a controlled substance in 1996 and 1997. ATF agents met the CI when he/she sustained the RICO conviction for which he/she received a 23-month sentence. He/she works as a CI for compensation, and ATF has paid him/her approximately $250,000 over 11 years.

[2] I identified SHAMBURGER as a firearms dealer while investigating Joseph Camerano, another firearms dealer and convicted felon. On July 1, 2022, the Honorable Rozella A. Oliver, U.S. Magistrate Judge, signed a Federal search warrant for Camerano's Instagram account. In reviewing those records, I found conversations between Camerano and SHAMBURGER regarding a firearms sale. On February 2, 2023, the Honorable Maria A. Audero, U.S. Magistrate Judge, issued a Federal search warrant for SHAMBURGER's Instagram accounts. There, I saw SHAMBURGER offering firearms for sale. For example, on April 1-2, 2022, SHAMBURGER sent a photograph of three firearms stating "Nigga come cash 💰 out the 9mm sold yesterday and all is left is to 40.s for a G ball 😒," which is referring to the price of the firearms. Based on those conversations, I directed the CI to contact SHAMBURGER to inquire about firearms for sale.

SHAMBURGER's Instagram account -- answered the phone and identified himself as Earl, which is SHAMBURGER's first name.

9.   During this recorded call, the CI asked SHAMBURGER about "toys," which, based on my training and experience, is slang for firearms. SHAMBURGER told the CI that "them mother fuckers" want a grand for a firearm that is brand new in the box.  SHAMBURGER then told the CI that he is in Pomona and to come back to Los Angeles.

10.  On March 7, 2023, based on my review of text messages, the CI texted SHAMBURGER, "Was up bruh talk to you earlier lets do this tomorrow noon time somewhere in Pasadena."  SHAMBURGER replied, "Yo i don't live out there and when your ready I'll bring it but Friday I'll be back with 10 of them."  The CI then told SHAMBURGER that he is ready to purchase a firearm today. SHAMBURGER then replied, "Sold them last night let me find you one." Based on my review of recorded calls, the CI then called SHAMBURGER, and SHAMBURGER told the CI that he can do it on Friday.

11.  On March 9, 2023, the CI texted SHAMBURGER and asked if he is going to have them "things," which, based on my training and experience and the context, refers to firearms. SHAMBURGER answered, "Yea my folks said tomorrow."

12.   On March 12, 2023, SHAMBURGER sent the CI the following photograph:



13.   On March 13, 2023, at my direction, the CI asked about the price of the firearms, and SHAMBURGER answered, "Compact 9mm $1000."  The CI told SHAMBURGER that the CI would buy both guns. SHAMBURGER replied, "Well there here before i show them to outher people who been asking got at you first since you been on me lol."  The CI and SHAMBURGER then agreed to meet in Pasadena that same day.

14.   At approximately 11:30am, I, along with other law enforcement agents, met with the CI at a predetermined location. I searched the CI and the CI's vehicle for contraband and found none.  At approximately 1:04pm, I then equipped the CI with an audio/video recording device and gave the CI $3,000 to buy the firearms.  Law enforcement then surveilled the CI to the agreed-upon location on Orange Grove Blvd in Pasadena, California.

15.   At approximately 1:46pm, SHAMBURGER called the CI on a recorded line and told the CI that he was at the corner of

Howard Street and Glen Avenue.  The CI and SHAMBURGER agreed to meet at Lolo's Repair Shop on Fair Oaks Avenue in Altadena, California, ("Lolo's").  At approximately 1:53pm, law enforcement surveilled the CI to Lolo's, and at approximately 2:01pm, observed the CI park on the street near Lolo's.

16.  I reviewed the audio/video recording and observed the following:

a.  At approximately 2:01pm, the CI exited the car and walked towards SHAMBURGER.  SHAMBURGER was parked at the vacant lot just south of Lolo's.  SHAMBURGER was near a Nissan SUV with temporary license plate number CL77K28 (the "Nissan SUV"). The CI and SHAMBURGER then greeted each other. SHAMBURGER directed the CI to the driver's side of the Nissan SUV, and reached near the floorboard of the front driver's side.

b.  The CI then approached the driver's door and told SHAMBURGER, "This shit's cool right here."  SHAMBURGER then replied, "Hell yeah.  I oiled the other one down."  The CI then confirmed the price of "1 each," and told SHAMBURGER to count the money.

c.  The CI and SHAMBURGER then engaged in small talk. SHAMBURGER told the CI that he is going to send him a "box" of firearms.  At approximately 2:04pm, the CI walked from the Nissan SUV towards the CI's car.  The CI then left the location.

d.  At approximately 2:05pm, law enforcement surveilled the CI back to the predetermined location.

17.  At approximately 2:20pm, at the predetermined location, I retrieved the audio and video recording device and

$1,000.  I then searched the CI and CI's car, and I recovered two Glock pistols and two magazines on the passenger seat of the CI vehicle.   The Glock pistols were later identified as (i) a Glock model 26, 9mm caliber pistol, bearing serial number BVYC271 with a magazine; and (ii) a Glock model 43, 9mm caliber pistol, bearing serial number BDZP674 with a magazine.

18.   Based on my review of the recordings of the controlled transaction, I recognized the seller of the firearms as SHAMBURGER based on SHAMBURGER's public Instagram account and photograph with the Department of Motor Vehicles.

**B.    SHAMBURGER Sells Two Firearms to the CI on March 17, 2023**

19.   On March 15, 2023, SHAMBURGER texted the CI photographs of firearms for sale:



20.   On that same day, the CI texted SHAMBURGER and asked for the price of the firearms, and SHAMBURGER replied, "$1000 a piece green one and black one," and "[t]hat pink one is a lil one for a lady $800 it's a 380."  In response, the CI asked

SHAMBURGER to hold the firearms until the CI could buy them. SHAMBURGER replied, "When you ready before they go," which, based on my training and experience, indicated that the firearms would be sold if the CI did not buy them.  The CI answered tonight or tomorrow, and SHAMBURGER agreed to hold them.

21.  On March 16, 2023, at my direction, the CI told SHAMBURGER that he could not purchase them that day, but that the CI would give SHAMBURGER an additional $200 for holding the firearms.  SHAMBURGER replied, "Wow and i brought them so you wouldn't be on hold," which indicated that SHAMBURGER bought the firearms from a source to then sell the firearms to the CI. SHAMBURGER then agreed to hold the firearms and sell them to the CI the next day at Lolo's.

22.  On March 17, 2023, the CI texted SHAMBURGER and said to meet at 11:00am.  SHAMBURGER replied, "OK bet I'll be there got a furnal to be at so I'll be there".

23.  At approximately 10:30am, law enforcement met with the CI at a predetermined location.  I searched the CI and the CI's car for contraband and found none.  At approximately 10:58am, I equipped the CI with an audio/video recording device and gave the CI $5,000 to buy the firearms.  Law enforcement then surveilled the CI to Lolo's.  At approximately 11:19am, law enforcement observed the CI park the CI's car on the street near Lolo's.

24.  I reviewed the audio/video recording and observed the following:

a.   At approximately 11:19am, the CI parked on the street near Lolo's and attempted to call SHAMBURGER.  At approximately 11:21am, the CI then exited the CI's car and walked towards the Nissan SUV, which was parked in the vacant lot just south of Lolo's.  The CI then greeted SHAMBURGER at the driver's door.

b.   The CI then approached to open driver's door and asked SHAMBURGER, "This all you got?"  SHAMBURGER replied that he was going to pick some other ones up.  SHAMBURGER indicated to the CI that he's going to a funeral and then could get the other firearms.

c.   The CI then asked SHAMBURGER if he sells dope. SHAMBURGER replied, "Yeah, my people be buying that uh.. that white."  The CI told SHAMBURGER that he was interested in purchasing crystal.  SHAMBURGER told the CI that he has a Mexican dude out in San Bernardino that will sell whatever the CI wants.  SHAMBURGER told the CI to let him know and he will find out the "ticket," referring to the price.  At approximately 11:24am, the CI walked towards the CI's car and left the location.

25.  At approximately 11:25am, law enforcement surveilled the CI back to the predetermined location.

26.  At approximately 11:38am, at the predetermined location, law enforcement retrieved the audio and video recording device.  I then retrieved $2,900.  I searched the CI and CI vehicle and recovered a Glock pistol and a Mossberg pistol and 2 magazines on the passenger seat.  The pistols were

later determined to be (i) a Glock model 43, 9mm caliber pistol, bearing serial number ADVD728 with a magazine and (ii) a Mossberg model MC1 SC, 9mm caliber pistol, bearing serial number 029096CP with a magazine.

27.  I then debriefed the CI.  The CI said that SHAMBURGER pulled the firearms from a stash spot behind the stereo and placed them on the driver's seat of the Nissan SUV, and that the CI paid SHAMBURGER $2,100 for the two firearms.

28.  Later that same day, the CI texted SHAMBURGER to buy additional firearms.  SHAMBURGER responded that he is still at the funeral.  SHAMBURGER texted the CI, "I got you a 45 to with bullshit."  The CI asked for the price, and SHAMBURGER replied, "45 $1200 i really want to keep it but i thought about you this one is not with that program feel me."  The CI agreed to buy the firearm, but SHAMBURGER did not respond.

C.  **SHAMBURGER Sells Three Firearms to the CI on March 20, 2023**

29.  On March 19, 2023, SHAMBURGER sent the CI photographs of firearms:



30.   On that same day, I directed the CI to text SHAMBURGER and ask for the price of the firearms and if they could meet the next day.  SHAMBURGER replied, "The bottom one is a 9mm $800 with shell's and the middle one is a 40 with the beam on it with shell's $1000 pink one is a baby 380 $700."  The CI agreed to buy the firearms the following afternoon, on March 20, 2023.

31.   On March 20, 2023, the CI asked SHAMBURGER if they could meet at the same spot.  SHAMBURGER replied, "Got a little to do out here in Los Angeles today but you could meet me off the 110 off hill street at that gasoline 🪫". SHAMBURGER and the CI then agreed to meet at 1pm.

32.   At approximately 12:30pm, law enforcement met with the CI at a predetermined location.  I searched the CI and the CI's car for contraband and found none.

33.   At approximately 1:12pm, based on my review of recorded calls, the CI called SHAMBURGER and told SHAMBURGER that there were police in the area and suggested that they meet at the Los Angeles State Historic Park.  The CI then texted SHAMBURGER the address, "1245 N spring st."  At approximately 1:17pm, I equipped the CI with an audio/video recording device and gave the CI $4,000 to buy the firearms.  Law enforcement then surveilled the CI to the parking lot of the Los Angeles State Historic Park.

34.   At approximately 1:58pm, SHAMBURGER called the CI on a recorded line.  The CI directed SHAMBURGER to the parking lot of the park.  At that same time, I observed the Nissan SUV driving on Spring Street towards the entrance of the park.  At

approximately 1:59pm, law enforcement observed the Nissan SUV pull into the parking lot, park next to the CI's car, and a female passenger exit the Nissan.

35.  I reviewed the audio/video recording and observed the following:

a.  At approximately 2:02pm, the CI approached the driver's door of the Nissan SUV and greeted SHAMBURGER. SHAMBURGER was sitting in the driver's seat.

b.  SHAMBURGER then exited the Nissan SUV and reached into the driver's door of the Nissan SUV to grab a brown paper Nike bag.  SHAMBURGER then handed the bag to the CI.  The CI asked if all three of them were in the bag, referring to the firearms.  SHAMBURGER confirmed, "All three of them."

c.  SHAMBURGER then told the CI that he "took the clips out because they got shells in them."  Based on my training and experience, "clips" is slang for magazines and "shells" is slang for ammunition.  SHAMBURGER then pointed and said, "That's for the 40, that's to the 9, and that's the 380."  Based on my training and experience, 40 is slang for a .40 caliber firearm, 9 is slang for a 9mm firearm, and 380 is slang for a .380 caliber firearm.

d.  The CI then carried the bag from the Nissan SUV and placed it in the rear driver's side floorboard of the CI's car.  The CI then walked back to the Nissan SUV and confirmed the price of $2,600 for the firearms.  SHAMBURGER agreed to the price.

e.    SHAMBURGER then asked if the CI does any, "big shit."  The CI asked what SHAMBURGER meant and SHAMBURGER asked, ".223s, AKs?".  Based on my training an experience, SHAMBURGER is referring to .223 caliber rifles and AK-style rifles.  The CI replied yeah.  SHAMBURGER then said, "Man . . . I got a mother fucker cut you a cool deal on them too."

f.    The CI then clarified the price of $2,500 plus an additional $100 for the holding fee from the previous firearms transaction on March 17, 2023.  SHAMBURGER then told the CI that he will send pictures.

g.    The CI then asked about dope that was mentioned at the last meeting.  SHAMBURGER responded, "You didn't tell me how much you want."  The CI then answered, a "QP," which, based on my training and experience, is slang for a quarter pound. The CI then said he'll do the "p" if it's cheaper.  SHAMBURGER then talked about having someone test it.  The CI answered that it is what it is.  SHAMBURGER then said that the CI will like it and that, "he got it for sure".

h.    SHAMBURGER then said that his source tries to have him, "take that shit all the time" but he, referring to himself, doesn't have customers for it.  The CI then told SHAMBURGER that he will take it.  SHAMBURGER then told the CI that he was getting them for $1300 or $1500 for "the whole big one."  Based on my training and experience, SHAMBURGER is referring to a pound of methamphetamine.  The CI confirmed that it was between $1300 and $1500. SHAMBURGER then said, "That's what he told me".

13

i.   The CI and SHAMBURGER then engaged in small talk. SHAMBURGER told the CI that he has "2 clips in this one but I gotta have it till I go get my other one."  The CI asked if that was the four-five, referring to the .45 caliber firearm, and if the CI could buy that firearm from him.  SHAMBURGER then answered, "no, I can't be riding without nothing."  SHAMBURGER then indicated that he would sell the firearm at a later date for $1100.

j.   At approximately 2:05pm the CI walked from the Nissan SUV towards the CI's car and left the location.

36.   At approximately 2:05pm, law enforcement surveilled the CI back to the predetermined location.  At approximately 2:15pm, at the predetermined location, I retrieved the audio and video recording device and $1,400.  I then searched the CI and CI vehicle and recovered a .40 caliber Sig Sauer pistol, a 9mm Taurus pistol, a .380 caliber Taurus pistol, a magazine loaded with .40 caliber ammunition, a magazine loaded with 9mm caliber ammunition, and 2 empty magazines on the driver's side rear floorboard.  I later determined that the magazine belonging to the Sig Sauer .40 caliber pistol was loaded with 11 rounds of ammunition and the magazine belonging to the Taurus 9mm pistol was loaded with 11 rounds of ammunition.

37.   The firearms and ammunition were later identified as (i) a Sig Sauer model P226 ELITE, .40 caliber pistol, bearing serial number 47A 056423 with a magazine; (ii) a Taurus model G2C, 9mm caliber pistol, bearing serial number TLR57514 with a magazine; (iii) a Taurus model PT738 TCP, .380 caliber pistol,

bearing serial number 10201B with a magazine; (iv) 11 rounds of assorted .40 caliber ammunition (10 of the rounds were manufactured by Winchester Ammunition and 1 of the rounds was manufactured by Sig Sauer); and (v) 11 rounds of 9mm caliber ammunition manufactured by Federal Cartridge Company.

38.  An ATF interstate nexus expert examined the firearms and ammunition and determined that they were manufactured outside of the state of California, and in order for them to be recovered in California, they had to have moved in interstate commerce.

    **D.**   **<u>SHAMBURGER Sells a Firearm and Ammunition to the CI on April 11, 2023</u>**

39.  On March 22, 2023, based on my review of text messages, the CI texted SHAMBURGER, "Was up bruh with your boy with that go fast," referring to methamphetamine. SHAMBURGER replied, "Let me hit him now".

40.  On March 28, 2023, the CI made a recorded call to SHAMBURGER and asked about the firearm that SHAMBURGER previously mentioned he had for sale.  SHAMBURGER told the CI, "Yeah, that's going to be yours, I gotta get back in town." The CI then asked about the methamphetamine connection in San Bernardino, and SHAMBURGER told the CI that he will call the person in San Bernardino.

41.  On April 8, 2023, SHAMBURGER texted the CI with the following photograph:



42.   The CI then asked SHAMBURGER what the price of the firearm was.  SHAMBURGER replied, "i needs to sale it today and i got a lot of bullets $1100".  The CI then told SHAMBURGER that if SHAMBURGER still has the firearm in a couple days, then the CI will take it.  SHAMBURGER replied, "it won't be there it's getting sold asap".

43.   On April 10, 2023, SHAMBURGER texted the CI, "Top of the am folks if your back and still want it let me know before i leave to Vegas".  The CI then told SHAMBURGER that the CI could pick up the firearm the next day, on April 11, 2023.

44.   On April 11, 2023, at approximately 3:45pm, SHAMBURGER texted, "Hey i am in Pasadena now".  The CI and SHAMBURGER then agreed to meet at Lolo's sometime before 6:00pm.

45.   At approximately 4:45pm, law enforcement met with the CI at a predetermined location.  I searched the CI and the CI's vehicle for contraband and found none.  An hour later, I

equipped the CI with an audio/video recording device and $1,500.
ATF agents then surveilled the CI to Lolo's.

46.   I reviewed the audio/video recording and observed the
following:

a.   At approximately 6:03pm, in a recorded call,
SHAMBURGER directed the CI to park in the driveway, which the CI
did.

b.   At approximately 6:05pm, the CI walked towards
the open gate of Lolo's and greeted SHAMBURGER who was wearing
light grey pants, a light grey sweatshirt, a blue hat, and was
holding a black plastic bag in his left hand.

c.   SHAMBURGER told the CI, "I had to put them in
here," and "it's loaded."  The CI confirmed the price of $1100
and SHAMBURGER agreed.  SHAMBURGER then said, "You aint getting
this till later on" and then said he would give it to the CI,
"sooner or later".

d.   SHAMBURGER then asked the CI if the CI wanted the
"45" tomorrow, referring to a .45-caliber firearm.  The CI told
SHAMBURGER that he wants the firearm, and SHAMBURGER told the CI
that his "boy" is bringing "shells," or ammunition, tomorrow.
The CI then told SHAMBURGER that the CI is shipping the firearms
out, referring to shipping firearms out of state.

e.   The CI then asked about the person in San
Bernardino.  SHAMBURGER then asked if the CI was referring to
the "crys," which based on my training and experience, "crys" is
slang for methamphetamine.  SHAMBURGER then told the CI that,

17

"they be right there with me" and that he used to sell it but his "folks" are out of state and now deal in cocaine.

       f. The CI then told SHAMBURGER that is trying to get a "p". SHAMBURGER then told the CI that he will contact him tomorrow and give the number for the San Bernardino person.

       g. At approximately 6:07pm, the CI walked from Lolo's towards the CI vehicle. The CI then left the location, and law enforcement surveilled the CI back to a predetermined location.

    47. At approximately 6:31pm, at the predetermined location, I retrieved the audio and video recording device and $400. I then searched the CI and CI vehicle and recovered a Kahr Arms pistol loaded with 6 rounds of ammunition, though no round in the chamber, and a water bottle with rounds of ammunition inside of a black plastic bag from the passenger seat.

    48. The firearms and ammunition were later identified as (i) one Kahr Arms model CW45, .45 caliber pistol, bearing serial number SF4997 with a magazine; (ii) 6 rounds of .45 caliber ammunition with headstamp, "N CCI R", that were loaded in the magazine; and (iii) 37 rounds of .45 caliber ammunition with headstamp, "N CCI R", that were inside of the Aquafina water bottle.

    49. An ATF interstate nexus expert examined the firearm and ammunition and determined that they were manufactured outside of the state of California and therefore, in order for

this firearm and ammunition to be recovered in California, they had to have moved in interstate commerce.

  **E.**  **SHAMBURGER Sells a Firearm to the CI on April 14, 2023**

  50. On April 13, 2023, SHAMBURGER texted the CI, "Bought ready to sale my 45 with 2 clips and shell" and sent the following photograph:



  51. The CI replied and asked SHAMBURGER to hold onto the firearm.

  52. On April 14, 2023, SHAMBURGER texted the CI, "Top of the am folks i am seeing or you ready today before i let someone else get it leaving up to Vegas later today let me know before hand".  The CI and SHAMBURGER then agreed to meet that same day at 1pm at Lolo's.

  53. At approximately 12:30pm, law enforcement met with the CI at a predetermined location, and searched the CI and the CI's vehicle for contraband and found none.  Roughly 15 minutes later, law enforcement equipped the CI with an audio/video

recording device and $2,500.  Law enforcement then surveilled the CI to Lolo's.

54.  I reviewed the audio/video recording and observed the following:

      a.   At approximately 1:10pm, in a recorded call, SHAMBURGER directed the CI to the driveway and told the CI to come to the passenger door of a white Charger.  Law enforcement was unable to view the license plate for this vehicle.

      b.   The CI then approached and opened the passenger door and greeted SHAMBURGER.  SHAMBURGER then handed the CI a black plastic bag and told the CI, "These two clips, they loaded already".  SHAMBURGER then mentioned that he wiped his fingerprints off.

      c.   SHAMBURGER then picked up a firearm from the passenger seat and appears to place it in a brown plastic bag. The CI then confirmed the price of $1200.  The CI then asked about SHAMBURGER's connection with methamphetamine, and SHAMBURGER answered, "I'm going there right now."

      d.   SHAMBURGER can be seen holding a cell phone with a red phone case and money in his hand.  SHAMBURGER told the CI, "Look, he just sent me these right here and you'll see the prices he's saying. He just sent me all these this morning." SHAMBURGER then told the CI, "I'll be making like $100 or $200." The CI told SHAMBURGER to let him know.

      e.   At approximately 1:12pm, the CI walked from the white Charger towards the CI vehicle.  The CI then departed the

location, and law enforcement surveilled him back to a predetermined location

55.  At approximately 1:27pm, at the predetermined location, law enforcement retrieved the audio and video recording device and $1300.00.  Law enforcement then searched the CI and CI vehicle and recovered a HS Product pistol, two magazines loaded with ammunition, a black plastic bag, and a brown plastic bag from the passenger seat of the CI vehicle.

56.  The firearm and ammunition were later identified as (i) HS Product, model XD45, .45 caliber pistol, bearing serial number XD671862, with two magazines; (ii) 13 rounds of .45 caliber ammunition with headstamp, "BLAZER", that were loaded in a magazine; and (iii) 13 rounds of .45 caliber ammunition with headstamp, "BLAZER", that were loaded in the other magazine.

57.  An ATF interstate nexus expert examined the firearm and ammunition, and determined that they were manufactured outside of the state of California, and in order for this firearm and ammunition to be recovered in California, they had to have moved in interstate commerce.

**F.    <u>SHAMBURGER sells the CI 2 Firearms on April 24, 2023</u>**

58.   On April 21, 2023, based on my review of text messages, SHAMBURGER texted the CI the following photographs:

  

59.   The CI agreed to purchase the firearms and asked SHAMBURGER to hold onto the firearms until Monday, April 24, 2023.

60.   On April 23, 2023, SHAMBURGER texted the CI the following photographs:





61.   The photograph above shows the firearm on top of mail addressed to "EARL" with last name starting with the letters "SH" at the apartment complex where the SUBJECT PREMISES is located.   The address on the mail does not show the apartment number.

62.   The CI and SHAMBURGER then agreed to meet the next day, on April 24, 2023, in Los Angeles.

63.   The next day, on April 24, 2023, at approximately 10:29am, SHAMBURGER texted the CI, "1730 w Manchester Ave Los Angeles," which is an address for a Ralph's grocery store. SHAMBURGER also asked the CI, "Hey could you come here just this time got to stay near the house for the cable man".   The address for the meet location is approximately 0.1 miles away from the SHAMBURGER's residence, the SUBJECT PREMISES.   The CI agreed to meet at 12:00pm.

64.   At approximately 11:00am, law enforcement met with the CI at a predetermined location, and searched the CI and the CI's vehicle for contraband and found none.   Approximately an hour

later, I equipped the CI with an audio/video recording device
and $5,000.  Law enforcement then surveilled the CI to the
parking lot of the Ralph's.

65.  At approximately 12:15pm, law enforcement observed the
CI vehicle drive into and park in the Ralph's parking lot, and
then a male, matching the description of SHAMBURGER carrying a
Ralph's grocery bag, approach the passenger side of the CI
vehicle.

66.  I reviewed the audio/video recording and observed the
following:

    a.  At approximately 12:20pm, over a recorded call,
SHAMBURGER told the CI that he is in front of the Ralph's.

    b.  At approximately 12:22pm, SHAMBURGER's voice can
be heard on the recording.  As the CI remained in the CI
vehicle, the CI asked how many firearms there were, and
SHAMBURGER answered two.  The CI then asked the price, and
SHAMBURGER answered that he wanted $1,200 for the .40 and $1000
for the 9mm, referring to a .40 caliber firearm and a 9mm
firearm.

    c.  SHAMBURGER then asked the CI if the CI still
wanted the pound for $1,200, referring to methamphetamine.  The
CI agreed to purchase the methamphetamine.  SHAMBURGER then told
the CI that he is going "out there right now" and that he will
get it if the CI wants it.  SHAMBURGER then said that he had
someone test it, and the CI agreed to buy the methamphetamine on
a future date.

67.   At approximately 12:23pm, law enforcement saw SHAMBURGER enter a 2015 black Maserati, bearing license plate #9FCZ599, currently registered and operated by SHAMBURGER (i.e., the SUBJECT VEHICLE) in the Ralph's parking lot, and then saw the black Maserati enter the garage of the apartment complex at the SUBJECT PREMISES.

68.   Law enforcement then surveilled the CI back to the predetermined location where I  retrieved the audio and video recording device and $2,800.  I then searched the CI and CI vehicle and recovered two Polymer 80 pistols with magazines and holsters and a brown plastic bag from the passenger seat of the CI vehicle.

69.   The firearms were later identified as (i) Polymer 80 model PF940C, .40 caliber pistol with a Polymer 80 frame bearing no serial number and a Glock slide with the marking BFGA340, with a magazine; and (ii) Polymer 80 model PF9SS, 9mm caliber pistol, bearing no serial number, with a magazine.

**G.    SHAMBURGER sells the CI 3 Firearms on May 31, 2023**

70.   On May 28, 2023, based on my review of text messages, SHAMBURGER texted the CI, "All 40.s brand new" and "Baby one's" and sent the following photographs:

 

71.   On May 29, 2023, the CI then asked SHAMBURGER what the price of the firearms were, and SHAMBURGER replied, "i was trying to make a move on a box of them was short $800 if you have cash app or zelle you could put up now I'll bless you with a great deal" and "Or pull up and get your products either or not trying to lose this deal".  The CI told SHAMBURGER that the CI would buy them with cash and will pay extra money for SHAMBURGER to hold the firearms.  SHAMBURGER replied, "Shit he will be gone let me see what i could do it's 10 good one's." SHAMBURGER then replied, "And i already have 4 with me now" and "OK bet so you want all 3 of them" and "i put them up until Wednesday".

72.  On May 30, 2023, the CI asked if SHAMBURGER could bring the firearms on Thursday, June 1, 2023.  SHAMBURGER replied, "Naw big dog i thought you said Wednesday so i didn't catch my flight because i needed that money and i was going to fly out afterwards".  The CI and SHAMBURGER then agreed to meet on Wednesday, May 31, 2023 at the Ralph's parking lot.

73.  On May 31, 2023, SHAMURGER texted the CI, "i only have 3 40.s left and i am making a hundred off them so $1100 a piece i was going to look out for you the outher day but when i gets theses box of ten I'll give you a better price on the first ones you picks I'll hit you first off coming in town I'll be back Friday".  The CI agreed to buy the firearms.  SHAMBURGER then texted, "And there compact very lil i kept me 2 of them".  The CI and SHAMBURGER agreed to meet around 1:00pm.

74.  At approximately 12:00pm, law enforcement met with the CI at a predetermined location, and I searched the CI and the CI's vehicle for contraband and found none.  Approximately forty minutes later, I equipped the CI with an audio/video recording device and $4,800.  Law enforcement then surveilled the CI to the parking lot of Ralph's where the previous buy had occurred.

75.  At approximately 12:45pm, law enforcement saw the CI's vehicle drive into and park in the Ralph's parking lot.  At approximately 12:48pm, law enforcement observed a male -- matching the description of SHAMBURGER and wearing an orange and black jacket with a hood and a satchel on his shoulder -- walk through the Ralph's parking lot and approach the CI vehicle's passenger door.

27

76.   I reviewed the audio/video recording and observed the following:

a.   At approximately 12:48pm, the CI and SHAMBURGER can be heard greeting each other and engaging in small talk. SHAMBURGER then told the CI that SHAMBURGER "kept me two of these little mother fuckers."   SHAMBURGER then can be heard saying that they are "compact" and that is why he likes them. SHAMBURGER then said that "mother fuckers got to go through too much getting them down here now," referring to sources that are transporting firearms to other states.   SHAMBURGER then said that someone got caught in Utah.

b.   At approximately 12:49pm, the CI said, "I see you fucking scratched the numbers out, right? The fucking serial numbers?" SHAMBURGER replied, "hell yeah".   The CI then begins to count out loud and says, "that's three. We cool."

c.   SHAMBURGER then said, "on that other shit, man they be having that fentanyl heavy in it."   SHAMBURGER then asked, "you don't care?"   The CI asked if they put it in the crystal (methamphetamine), and SHAMBURGER replied, "they put it in weed, and everything now".   The CI indicated to SHAMBURGER that if SHAMBURGER can get it, the CI will purchase it. SHAMBURGER then replied, "I can get it for sure."

d.   The CI and SHAMBURGER then engaged in small talk regarding narcotics.   During the small talk, SHAMBURGER mentioned meeting the CI the next time with his Maserati, the SUBJECT VEHICLE.

e.   At approximately 12:52pm, the conversation ended, and law enforcement observed SHAMBURGER exit the CI's car and begin walking in the parking lot.  Law enforcement then saw SHAMBURGER walk into the apartment complex where the SUBJECT PREMISES is located, which is directly south of the Ralph's.

77.   ATF agents then surveilled the CI back to the predetermined location, and at approximately 1:03pm, at the predetermined location, I retrieved the audio and video recording device and $1,300 from the CI.  I then searched the CI and CI's vehicle and recovered 3 Taurus G2C pistols with magazines from the passenger seat of the CI vehicle.

78.   I also debriefed with the CI, and the CI informed me that SHAMBURGER was carrying a firearm on his waist during the meeting.

79.   The firearms were later identified as (i) Taurus model G2C, .40 caliber pistol, with the serial number scratched off and two magazines; (ii) one Taurus model G2C, .40 caliber pistol, with the serial number scratched off, and two magazines; and (iii) one Taurus model G2C, .40 caliber pistol with the serial number  scratched off, and two magazines.

H.   **SHAMBURGER is a Convicted Felon**

80.   On September 29, 2022, I reviewed SHAMBURGER's criminal history records and learned that SHAMBURGER has been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.   On or about May 21, 1984, Possession of Narcotics for Sale, in violation of California Health and Safety Code

Section 11351, in the Superior Court for the State of California, County of Los Angeles, Case Number A566236;

   b.   On or about May 26, 1992, Vehicle Theft, in violation of California Vehicle Code Section 10851(A), and Receiving Known Stolen Property California, in violation of California Penal Code Section 496.1, in the Superior Court for the State of California, County of Los Angeles, Case Number YA011783;

   c.   On or about May 18, 2009, Grand Theft Auto, in violation of California Penal Code Section 487(D)(1), in the Superior Court for the State of California, County of Los Angeles, Case Number TA11987101; and

   d.   On or about July 9, 2011, Evading a Peace Officer, in violation of California Vehicle Code Section 2800.2(A), and Carrying Concealed Dirk or Dagger, in violation of California Penal Code Section 12020(A)(4), in the Superior Court for the State of California, County of Los Angeles, Case Number GA08372201.

## I.   Recent Investigation of the Premises and Vehicle to be Searched

   81.   As noted above, on April 23, 2023, SHAMBURGER texted the CI a photograph of firearms on top of mail addressed to him at the apartment complex where the SUBJECT PREMISES is located.

   82.   In addition, on April 17, 2023, the Honorable Darrell Mavis, State of California Magistrate Judge, signed a state ping warrant for SHAMBURGER's telephone number to assist in locating his whereabouts.  The pings are pinging at cell towers that are

in close proximity to the SUBJECT PREMISES.  The following are photographs of the pings, with the large cluster of pings reflecting the location of the SUBJECT PREMISES:





83.  On April 24, 2023, SHAMBURGER drove the SUBJECT
VEHICLE to and from the controlled transaction in which he sold
the CI two firearms.  I queried its license plate BX69W51, and
found that it was registered as a 2015 Maserati with VIN
ZAM57XSA7Fl149617.  At the time of the transaction, the SUBJECT
VEHICLE was not registered by SHAMBURGER, however, on June 2,
2023, I queried law enforcement databases and saw that the
SUBJECT VEHICLE is now registered to SHAMBURGER at the SUBJECT
PREMISES.

84.  As noted above, on May 15, 2023, the Honorable Maria
A. Audero, U.S. Magistrate Judge, issued a Federal search
warrant for SHAMBURGER's Instagram account.  I searched the
Instagram account pursuant to the warrant.  During my search, I
observed a conversation between SHAMBURGER and another Instagram
user.  On October 4, 2022, the Instagram user asked SHAMBURGER
for his address and SHAMBURGER replied, "8711 s Harvard Blvd Los
Angeles 90047 APT #413," (the SUBJECT PREMISES).  On February
14, 2023, SHAMBURGER messaged the Instagram user that same
address, the SUBJECT PREMISES.



## V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

85.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.  Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.  Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience,

individuals who engage in street sales of firearms frequently
use phone calls, e-mail, and text messages to communicate with
each other regarding firearms that the sell or offer for sale.
In addition, it is common for individuals engaging in the
unlawful sale of firearms to have photographs of firearms they
or other individuals working with them possess on their cellular
phones and other digital devices as they frequently send these
photos to each other to boast of their firearms possession
and/or to facilitate sales or transfers of firearms.

      d.    Individuals engaged in the illegal purchase or
sale of firearms and other contraband often use multiple digital
devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

86.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

      a.    Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained

---

[3] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

87.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

88.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

89.  Thus, the warrants I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SHAMBURGER's thumb- and/or fingers on

the device(s); and (2) hold the device(s) in front of SHAMBURGER's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

90.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. <u>CONCLUSION</u>

91.  For all of the reasons described above, there is probable cause to believe that SHAMBURGER has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of Firearms on March 20, 2023.

92.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT VEHICLE described in Attachment A-1, the SUBJECT PREMISES described in Attachment 2, and the person of SHAMBURGER described in Attachment A-3.


Attested to by the applicant in accordance with the
requirements of Fed. R. Crim. P. 4.1 by telephone on June 13,
2023, 4:07 p.m.

_Karen L. Stevenson_
THE HONORABLE KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE